UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at Pikeville)

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | Criminal Action No. 7: 24-007-DCR |
| ) | |
| V. ) | |
| ) | |
| DANIEL JACKSON, ) | **MEMORANDUM OPINION** |
| ) | **AND ORDER** |
| Defendant. ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

A jury convicted Daniel Jackson of possessing methamphetamine and fentanyl with the intent to distribute it in violation of 21 U.S.C. § 841(a)(1). At the close of the government's evidence, and again after the close of the defendant's case, the Court declined to grant the defendant's motion for a judgment of acquittal. Jackson has now filed a motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. Jackson's motion will be denied because the interests of justice do not warrant granting a new trial.

**I.[1]**

On the evening of February 7, 2024, Magoffin County Sheriff's Deputies Eugene Salyer and Neil Watson were in Royalton, Kentucky, attempting to serve a warrant in an unrelated matter. As the officers drove in separate cruisers, they encountered an "older model black Chevrolet" with a license plate that was not illuminated and appeared to have spray paint over some of the letters. Salyer activated his blue lights to make a traffic stop and the truck

---

[1] This factual background is based on the trial testimony of Magoffin County Sheriff's Deputies Eugene Salyer, Neil Watson, Donavon Watson, and Defendant Daniel Jackson.

signaled to turn into nearby a residence. At that point, Salyer realized that Defendant Jackson was most likely the driver since Salyer had seen Jackson in the truck at least five or six times and had seen him at that residence previously. The Magoffin County Sheriff's Department had been keeping an eye out on Jackson because it had received multiple anonymous complaints about him selling drugs illegally.

Jackson pulled into the residence, exited the vehicle, and—despite the police cruiser's flashing lights— began walking toward the residence. Jackson stopped when Salyer began yelling at him but acted nervous and would not make eye contact with the officers. Salyer asked Jackson for his driver's license and proof of insurance. Jackson conceded that he did not have either one. Salyers ran Jackson's information and discovered that the defendant's license was "DUI suspended" and "expired and canceled due to failure to maintain insurance." Salyer then advised Jackson he was being arrested for driving on suspended license.

Deputy N. Watson[2] performed a quick pat down of Jackson's pants pockets but did not discover anything. Salyer then placed the unhandcuffed Jackson in the back of his (Salyer's) cruiser. Salyer contacted Deputy Donavon Watson, who arrived on the scene within minutes with his K-9 partner Nitro. Nitro positively alerted for the presence of narcotics inside the vehicle after conducting a free air sniff around Jackson's vehicle.

Salyer, N. Watson, and D. Watson commenced searching Jackson's truck. Salyer searched the driver's side and located a syringe behind the driver's seat. D. Watson searched the passenger side of the truck. He located a black Wahl hair clipper box concealed within

---

[2]  Deputies Neil Watson and Donovan Watson participated in the February 7, 2024, search of Jackson's truck and his subsequent arrest. For the sake of clarity and brevity, they will be referred to as "N. Watson" and "D. Watson," respectively.

cavity behind the glove compartment. The box contained used syringes, a baggie of marijuana, a digital scale with residue, and methamphetamine. Once D. Watson realized the box contained narcotics, he carried it from Jackson's truck and placed it on the hood of Salyer's patrol car, where Salyer and N. Watson inspected it.

D. Watson returned to Jackson's truck and shined his flashlight into the cavity that housed the glove compartment and located a Maglite flashlight. Noticing that the flashlight felt heavier than expected, Watson opened it and discovered a significant amount of methamphetamine inside. He placed that substance on the hood of Salyer's patrol car with the rest of the seized items.

Around this time, Deputy Tyler Lafferty arrived on scene. Salyer, N. Watson, and D. Watson testified that Lafferty was on site for brief period and did not participate in the search or collection of evidence. Salyer explained that Lafferty "just basically walked up, talked to us for a second, looked at what we found," and left to attend to another matter. (However, Lafferty did attempt to interview Jackson later after he was transported to the Sheriff's Department.)

Following his discovery of drugs in the truck, Deputy N. Watson arrested Jackson for distributing methamphetamine. But when Jackson stepped out of Salyer's cruiser, N. Watson observed a cellophane bag containing a brown substance (later determined to be fentanyl) near where Jackson had been sitting. Salyer testified that Jackson was the first person to have been placed in the back of the cruiser that day. Further, he had checked the back of his cruiser earlier that day and did not find any drugs.

Deputy N. Watson immediately seized the cellophane bag containing fentanyl and placed it on the hood of Salyer's vehicle with the rest of the evidence. Salyers, N. Watson,

and D. Watson testified that the evidence was photographed, bagged, and placed in a secured lockbox in the back of Salyer's cruiser. They then took the evidence to the Sheriff's Department where it was weighed, bagged, logged, and sent to the Kentucky State Police Laboratory for testing.

Defendant Jackson also testified at trial. He maintained that Deputy Lafferty participated in search of his vehicle. Specifically, Jackson testified that he was able to observe the search of his truck from the back of Salyer's cruiser and that he watched Lafferty walk directly to the dashboard of his truck and retrieve evidence. Jackson testified that "they" then got him out of Salyer's cruiser and found "some brown stuff in a bag." Jackson maintained, however, that he previously had seen Lafferty holding the bag of brown substance. Finally, Jackson denied that any of the controlled substances found in his truck or in Salyer's cruiser belonged to him.

## II.

Rule 33 of the Federal Rules of Criminal Procedure states that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." A moving defendant bears the burden of demonstrating that a new trial is warranted. *United States v. Davis*, 15 F.3d 526, 531 (6th Cir. 1994). "[I]t is widely agreed that Rule 33's 'interest of justice' standard allows the grant of a new trial where substantial legal error has occurred." *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010). The decision whether to grant a new trial "is left to the sound discretion of the district court." *United States v. Pierce*, 62 F.3d 818, 823 (6th Cir. 1995) (citation omitted).

III.

A.

Jackson requests a new trial on two grounds.  First, he contends that the Magoffin County Sheriff's Department wrongfully permitted and/or authorized the destruction of his truck, which was "potentially useful" evidence.  But the government does not have an absolute duty to preserve all evidence that could conceivably have some evidentiary significance. *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).  The government violates a defendant's due process rights only where the government acts in bad faith in destroying "potentially useful" evidence.  *See id.*

Whether the destruction of potentially useful evidence violates due process is analyzed under the following three-part test, which places the burden on the defendant to demonstrate "(1) that the government acted in bad faith in failing to preserve the evidence; (2) that the exculpatory value of the evidence was apparent before its destruction; and (3) that the nature of the evidence was such that the defendant would be unable to obtain comparable evidence by other reasonably available means." *United States v. Jobson*, 102 F.3d 214, 218 (6th Cir. 1996) (citing *Youngblood*, 488 U.S. at 57-58).  The first two elements are interrelated.  "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Jobson*, 102 F.3d at 218 (citing *Youngblood*, 488 U.S. 56-57).

Jackson does not identify any basis to suggest that the government acted in bad faith by failing to preserve his vehicle.[3] *See United States v. Wright*, 260 F.3d 568, 571 (6th Cir.

---

[3]    Case Agent DEA Task Force Officer James Grigsby was unaware of the truck's status at the time of trial.  Jackson testified that his truck was "at the impound" and "had a holder on

2001) (observing that negligence, even gross negligence, on the part of the government does not constitute bad faith). Further, Jackson does not explain how his truck, an examination of it, or additional photographs of it, would have possessed exculpatory value. In support of his motion, Jackson provides nothing more than conclusory allegations concerning the usefulness of the truck as evidence—asserting that it was "central to the investigation," and that the deputies talked about it during their testimony at trial. Then, without providing any logical bridge whatsoever, he asserts that an examination of the truck might have exonerated him.

Since Jackson is unable to explain why the truck had exculpatory value, the government necessarily could not have been aware of such evidentiary value at the time the truck was destroyed. Simply alleging that the evidence "might have exonerated" him is insufficient. Accordingly, Jackson's due process claim fails. *See, e.g., United States v. Anderson*, 488 F. App'x 72, 75 (6th Cir. 2012) (observing that "the materials in question came from [the defendant's] *own trash*. To the extent, then, that her trash contained anything exculpatory, she should be able to provide some idea how it could have been materially favorable to her."); *United States v. Rastelli*, 870 F.2d 822, 833 (2d Cir. 1989) (rejecting the defendant's due process claim because the missing evidence would have been as probative of the defendant's guilt as his innocence).

Next, Jackson has failed to rebut the government's argument with respect to reasonably available comparable evidence. [*See* Record No. 35, p. 5.] Deputy Salyer testified at trial that he took photographs of Jackson's truck, including the glove compartment area where Deputy

---

it" the last time he saw it. The government tendered a Commonwealth of Kentucky "Crime Supplement" with its response in opposition to Jackson's motion for a new trial indicating that Jackson's truck was crushed by a recycling service around July 2024. [*See* Record No. 35-2, p. 1.]

D. Watson located the black hair clipper box and Maglite flashlight. Despite having an opportunity to file a reply to the United States' response to his motion for a new trial, Jackson has failed to do so and thus has not explained why those photographs did not constitute sufficient comparable evidence.

**B.**

Jackson also argues that he is entitled to a new trial because "the drug evidence introduced at trial, particularly the fentanyl, was substantially altered prior to trial." He elaborates that the substance had been removed from its original packaging and appeared in a different size and shape than on the date of the incident, thus prejudicing the defendant. However, Deputy N. Watson (who discovered the cellophane bag containing fentanyl in Salyer's cruiser) clarified the circumstances during his testimony at trial. N. Watson showed the bag to the jury and explained, "this looks like the bag but it was not packaged like this . . . it does look different because it is in these evidence bags." He further stated that the substance was in "more of a ball shape when [he] found it" and "was in a cellophane bag that had a knot in it." In terms of size, N. Watson explained that "it wasn't much" and acknowledged that it was maybe "three or four inches at most."

As noted by the government, controlled substances must be removed from their original packaging for purposes of laboratory testing. The Court agrees that the physical characteristics of the fentanyl and its packaging are important considering the government's theory that Jackson concealed the substance on/in his person and brought it into the police car. However, N. Watson testified regarding the fentanyl's physical characteristics at the time of its seizure and the government introduced contemporaneous photographs of the substance taken by the

- 8 -

Sheriff's Department. In light of this clarifying evidence, Jackson has not demonstrated any prejudice resulting from alterations in evidence that occurred due to laboratory testing.

### IV.

Based on the foregoing analysis, it is hereby

**ORDERED** that Defendant Jackson's motion for a new trial [Record No. 34] is **DENIED**.

Dated: October 23, 2024.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky